UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ANDY JAMES BROWN #520918,

                  Petitioner,              Case No. 1:18-cv-51

v.                                 Hon. Janet T. Neff

MATT MACAULEY,[1]

                  Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a state prisoner's habeas corpus action brought under 28 U.S.C. § 2254. Petitioner Andy James Brown is incarcerated with the Michigan Department of Corrections (MDOC) at the Bellamy Creek Correctional Facility in Ionia, Michigan. Following a nine-day jury trial in the St. Joseph County Circuit Court, Petitioner was convicted of second-degree murder, pursuant to Mich. Comp. Laws § 750.317, and possession of a firearm during the commission of a felony (felony-firearm), pursuant to Mich. Comp. Laws. § 750.227b, in connection with the shooting of Petitioner's business partner, David Locey. On August 29, 2014, the court sentenced Petitioner to 450 to 900 months on the second-degree murder conviction and a consecutive two-year term on the felony-firearm conviction.

On January 12, 2018, Petitioner timely filed his habeas corpus petition.

The petition raises four grounds for relief, as follows:

---

[1] Although Petitioner remains incarcerated at Bellamy Creek Correctional Facility, Matt McCauley has succeeded Tony Trierweiler as the Warden of that facility. Accordingly, Matt McCauley is substituted as the Respondent pursuant to Federal Rule of Civil Procedure 25(d) and the caption amended as set forth above.

I.      Petitioner was denied his rights to confrontation, cross-examination, and the assistance of counsel when the jury foreperson who knew the decedent and the decedent's family introduced material, extrinsic information during deliberations regarding the decedent, the decedent's family, and an alleged motive she attributed to Petitioner for killing the decedent.

II.     Petitioner was denied his right to an impartial jury and a fair trial when the jury foreperson, Fox, failed to disclose information during voir dire that would have led to her being excused for cause. Approximately 140 potential jurors underwent voir dire before trial in this case. Because the case was well known, many potential jurors were dismissed for cause because they knew the decedent and his family, Petitioner and his family, or others involved in the case. However, one such juror—Fox—was not excused for cause; instead, she became the foreperson.

III.    Petitioner was denied the right to a fair trial where the trial court improperly admitted evidence of cell tower locations. The prosecution's supposed expert at trial, Paul Gonyeau, testified about his interpretations of data received from Petitioner's mobile phone carrier. Gonyeau was unqualified to accurately interpret the data produced by the carrier and was therefore ill equipped to testify as to where Petitioner's cell phone was located on the morning of October 2, 2013. Indeed, Gonyeau had never been qualified as an expert in any court before his testimony in this case.

IV.    Petitioner was denied effective assistance of counsel where his trial attorneys failed to challenge the prosecution's gunshot primer residue evidence. Petitioner's trial attorney's failure to present an expert to challenge the prosecution expert's opinions constitutes deficient performance.

(Pet., ECF No. 1, PageID.6–15.)

Respondent has filed an answer to the petition (ECF No. 7) stating that the petition should be denied as to all grounds because they are without merit. Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I recommend that the petition be **DENIED**.

## Discussion

### I.      Factual background

The Michigan Court of Appeals set forth the essential facts of the case as follows:

2

> Defendant was convicted of murdering David Locey. Locey owned Locey CPA, which was located at the intersection of M-66 and Wait Road in Sturgis, Michigan. Defendant was a shareholder in Locey CPA. In 2013, one of defendant's clients, VIP Auto Body, terminated defendant's services after it found evidence of embezzlement. On Monday, September 30, 2013, an attorney for VIP Auto Body spoke with Locey about the alleged embezzlement. On Tuesday, October 1, 2013, Locey met with defendant. Locey told defendant that he had not yet decided whether to terminate defendant's employment although he was leaning towards doing so. He had defendant's laptop computer brought to Ascend Computer so that it could be backed up to ensure that no files were deleted. On Wednesday, October 2, 2013, Locey left for work shortly after 7:00 a.m. He stopped at a Snappy Mart, and surveillance video showed him driving away from the gas station at 7:12 a.m. According to the ADT alarm panel at Locey CPA, Locey disarmed the alarm system at 7:13 a.m. Shortly before 8:00 a.m., Tammy Brunner, an employee of Locey CPA, found Locey dead in his office with a gunshot wound to his head.

(Mich. Ct. App. May 10, 2016 Op., ECF No. 8-27 at PageID.2918.)

The trial court sentenced Petitioner to 450 to 900 months' imprisonment on the second-degree murder charge and a consecutive two-year term on the felony-firearm charge. (Sent. Tr., ECF No. 8-25 at PageID.2789–90.) On February 24, 2015, Petitioner filed a motion for new trial raising several issues, including that the jury foreperson introduced material, extraneous information into the jury deliberations; that the jury foreperson had an actual or implied bias against Petitioner that she failed to disclose during jury selection; and that trial counsel was ineffective by, among other things, failing to present an expert in gunshot primer residue to challenge the prosecution expert's opinions. (ECF No. 1-1 at PageID.186–200, 206–07.) On September 14, 2015, the trial court held an evidentiary hearing, at which it heard testimony from two jurors and Petitioner's trial counsel concerning issues Petitioner raised in his motion for new trial. At the conclusion of the hearing, the trial court denied the motion. (ECF No. 8-26 at PageID.2906–16.)

On direct appeal to the Michigan Court of Appeals, Petitioner, with the assistance of counsel, raised eight claims, including the four claims that he asserts in his habeas petition. (ECF No. 8-27 at PageID.2964–65.) By unpublished opinion issued on May 10, 2016, the Michigan

Court of Appeals affirmed Petitioner's conviction and sentence.  (Mich. Ct. App. Op., ECF No. 8-27 at PageID.2918–33.)

Petitioner then filed an application for leave to appeal to the Michigan Supreme Court, raising the same eight claims he had raised in the court of appeals and an additional claim. (ECF No. 8-28 at PageID.3186–87.) By order entered January 13, 2017, the Michigan Supreme Court denied the application because it was not persuaded that the questions presented should be reviewed. (ECF No. 8-28 at PageID.3182.)

Petitioner did not seek review by the United States Supreme Court.

## II.    AEDPA standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams*, 529 U.S. at 381-82; *Miller v. Straub*, 299 F.3d 570,

578-79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37-38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial

court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

### III.    Analysis

#### A.    Juror Issues

During *voir dire*, Juror 23, also identified as MF, told the court that she had known the victim and his family for many years, noting that her son (who was then 45-years-old) had played Little League baseball with the victim's son when they were children.[2] (ECF No. 8-10 at PageID.808, 810.) MF said that she knew the victim and his wife well enough to say hello, that she had visited the victim's farm regularly and that, on occasion, she would call him for donations for charitable causes. (*Id.* at 808, 810.) MF also said that she knew Petitioner's family, although she did not know Petitioner. (*Id.* at PageID.809.)  When asked about whether her relationship with the victim and his family would prevent her from being fair and impartial to either side, MF said she could be a fair and impartial juror and that the relationship would not affect her view of the case. (*Id.* at PageID.809, 812–14.) MF also said that she lived in Sturgis and that she had "read things in the media" about the case. (*Id.* at PageID.811.) The court, having questioned MF and concluding that she could be impartial, denied defense counsel's challenge to dismiss MF for cause. (*Id.* at PageID.814–16.)

MF was eventually selected foreperson of the jury. After the case concluded, two jurors contacted defense counsel with concerns regarding MF's conduct during deliberations. The jurors, MK and BAS, testified about these concerns during the hearing on Petitioner's motion for a new trial. MK testified that based on MF's comments during deliberations, it appeared that she had a personal relationship with the victim's family. MK said that MF indicated that she served on a

---

[2] The court and counsel questioned MF in a separate room outside the presence of the other jurors in accordance the procedure it had adopted for the jury selection. (ECF No. 8-10 at PageID.630.)

board with the victim, that the victim's wife looked like she had lost a lot of weight and did not look well as a result of the incident, that the victim had done a lot for the community and that the victim's family was a good family and deserved the right answer. (ECF No. 8-26 at PageID.2805–07.) MK also stated that MF commented that Petitioner killed the victim to save his (Petitioner's) marriage. (*Id.* at PageID.2806.) MK's primary concern was that MF's comments suggested that she did not disclose the full extent of her relationship with the victim's family during jury selection. (*Id.* at PageID.2811.) BAS's testimony was similar. She said that MF had commented on the toll the incident had taken on the victim's wife because MF knew her from coming into the bank where MF worked, and she also mentioned that she served on a board with the victim. BAS also testified regarding MF's comment that Petitioner had shot the victim because his wife was going to leave him. (*Id.* at PageID.2820–21.)

The trial court denied the motion for new trial based on MF's conduct, finding that her statement regarding Petitioner's motive for killing the victim was the only arguable extrinsic evidence, but MF's comments were not extrinsic because evidence in the case supported her theory, and there was no indication that it was based on knowledge from any source other than the trial evidence. Regarding MF's other comments bearing on her relationship with the victim and his family, the trial court found that MF disclosed most of those matters during jury selection and that the court was not permitted to delve into the jurors' deliberations. (*Id.* at PageID.2828, 2830–31.)

### 1.    Introduction of Extrinsic Evidence

Petitioner argues that his rights to confrontation, cross-examination and the assistance of counsel were violated when MF introduced extrinsic information during deliberations regarding the victim and his family and an alleged motive that she attributed to Petitioner for killing the victim. "As a matter of law, clearly established Supreme Court precedent requires that a criminal

defendant be afforded the right to confront the evidence and the witnesses against him, and the right to a jury that considers only the evidence presented at trial." *Doan v. Brigano*, 237 F.3d 722, 733 n.7 (6th Cir. 2001) (citing *Parker v. Gladden*, 385 U.S. 363, 364–65 (1966), and *Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965)), *overruled on other grounds by Wiggins v. Smith*, 539 U.S. 510, 123 (2003); *see also Smith v. Nagy*, 962 F.3d 192, 199 (6th Cir. 2020) (noting that the Sixth Amendment's "guarantee requires a jury to arrive at its verdict 'based upon the evidence developed at trial'" (quoting *Turner*, 379 U.S. at 472)). A Sixth Amendment violation occurs when a jury is exposed to extrinsic evidence or other extraneous influence. *See Tanner v. United States*, 483 U.S. 107, 117-18 (1987); *Doan*, 237 F.3d at 736. "[I]nformation is deemed 'extraneous' if it derives from a source 'external' to the jury." *Warger v. Shauers*, 574 U.S. 40, 51 (2014) (quoting *Tanner*, 483 U.S. at 117). "'External matters include publicity and information related specifically to the case jurors are meant to decide, while 'internal' matters include the general body of experiences that jurors are understood to bring with them to the jury room." *Id.* (citing *Tanner*, 483 U.S. at 117–18.) The difference between external and internal matters is important because "an evidentiary hearing delving into allegations of juror misconduct is required only where 'extrinsic influence or relationships have tainted the deliberations.'" *Garcia v. Andrews*, 488 F.3d 370, 375 (6th Cir. 2007) (quoting *Tanner*, 483 U.S. at 120).

The Michigan Court of Appeals rejected this claim as follows:

A defendant has a right to be tried by a fair and impartial jury. *Duncan v. Louisiana*, 391 US 145, 153; 88 S Ct 1444; 20 L Ed 2d 491 (1968). Consistent with this right, a jury may only consider the evidence that is presented in open court. *People v. Budzyn*, 456 Mich 77, 88; 566 NW2d 229 (1997). A jury's consideration of extraneous facts not introduced into evidence deprives a defendant of his constitutional rights of confrontation, cross-examination, and effective assistance of counsel. *Id.* To establish that an extraneous influence was error requiring reversal, a defendant must show: (1) the jury was exposed to an extraneous influence and (2) the extraneous influence created a real and substantial possibility that it could have affected the jury's verdict. *Id.* at 88–89. If the defendant proves

these two points, then the burden shifts to the prosecution to demonstrate that the error was harmless beyond a reasonable doubt. *Id.*

A firmly established common-law rule prohibits the admission of juror testimony to impeach a jury verdict. *People v. Fletcher*, 260 Mich App 531, 539; 679 NW2d 127 (2004). The only recognized exception to this common-law rule relates to situations in which the jury verdict was affected by an extraneous influence. *Id.* So, where there is evidence to suggest that the verdict was affected by an influence external to the trial proceedings, a court may consider juror testimony to impeach a verdict. *Id.* But where the alleged misconduct relates to influences internal to the trial proceedings, a trial court may not invade the sanctity of the deliberative process. *Id.* The distinction between an external influence and inherent misconduct is not based on the location of the wrong. *Budzyn*, 456 Mich at 91. "Rather, the nature of the allegation determines whether the allegation is intrinsic to the jury's deliberative process or whether it is an outside or extraneous influence." *Id.* In general, "information is deemed 'extraneous' if it derives from a source 'external' to the jury." *Warger v. Shauers*, __ U.S. __; 135 S Ct 521; 529; 190 L Ed 2d 422 (2014). "'External' matters include publicity and information related specifically to the case the jurors are meant to decide, while 'internal' matters include the general body of experiences that jurors are understood to bring with them to the jury room." *Id.*

Defendant argues that MF introduced the following extraneous information to the jury during deliberations: (1) she had a close and longtime personal relationship with Locey and his wife; (2) she served on a board with Locey[;] (3) she worked at the bank that Locey and his wife used; (4) Locey's wife had lost a lot of weight, and (5) she had a great deal of sympathy for the Locey family because of her relationship with them, and (6) defendant killed Locey because his wife, Heather Brown, was going to leave him. Initially, MF did not tell the jury that she had a close and longtime personal relationship with Locey and his wife. Both MK and BAS, two jurors, testified that MF made comments which indicated or caused them to think that MF had a personal relationship with Locey and his wife. Additionally, MF did not tell the jury that because of her relationship with the Locey family, she had a great deal of sympathy for them. MK was asked if MF said that she had a great deal of sympathy for the Locey family, but the trial court sustained an objection to the question, and MK did not answer it.

According to MK, MF told the jury that defendant killed Locey to save his marriage. Similarly, BAS testified that MF said that defendant killed Locey because Heather was going to leave him. The trial court found that these statements were not an extraneous influence because there was evidence to support MF's theory for why defendant killed Locey. At trial, Heather testified that in the early morning hours of October 1, 2013, defendant left the house because of an argument. Additionally, Joy Stevens, an employee of Locey CPA who attended the October 1, 2013 meeting, testified that Heather was agitated and angry at defendant at the meeting and called him names, such as liar, thief, embezzler, and cheat. According to Brunner, Heather was upset when she left the meeting and squealed the tires of

her car as she left the parking lot. Based on this testimony, we are not left with a definite and firm conviction that the trial court made a mistake in finding that the evidence presented at trial supported a theory by a juror that defendant killed Locey because Heather was going to leave him. *Miller*, 482 Mich at 54. Accordingly, MF's statements that defendant killed Locey because Heather was going to leave him were not an extraneous influence. We note that there was no testimony from MK or BAS to indicate that MF's theory regarding defendant's motive was based on anything other than the evidence presented at trial.

There was testimony from MK and BAS that MF told the jury that she served on a board with Locey, that Locey's wife had lost a lot of weight, and that MF worked at the bank used by Locey and his wife. These statements were not an extraneous influence, as the statements did not derive from a source external to the jury. *See Warger*, ___ U.S. at ___; 135 S Ct at 529. The statements were based on MF's own personal experience and knowledge, not on anything she had read or heard about the case, and the statements did not provide her or the jury with any specific information or knowledge regarding Locey's murder. See *id.* at ___; 135 S Ct at 529.

Because defendant has not shown that MF introduced any extraneous information to the jury, the trial court did not abuse its discretion in denying defendant's motion for a new trial based on MF introducing an extraneous influence on the jury. *Miller*, 482 Mich at 544.

(ECF No. 8-27 at PageID.2923–25.)

Regarding MF's comments concerning the victim and his family (she served on a board with the victim, his wife had lost a lot of weight, and MF worked at the bank the victim and his family used), the court of appeals cited the Supreme Court's opinion in *Warger* to conclude that these statements were based on MF's personal experience and knowledge rather than anything external to the deliberations and thus fell on the internal side of the spectrum. The Court in *Warger* observed that external matters "include publicity and information *related specifically* to the case the jurors are meant to decide." 574 U.S. at 51 (italics added). It concluded that the jury foreperson's statements regarding a previous accident in which her daughter was at fault "may well have informed her general views about negligence liability for car crashes, but it did not provide either her or the rest of the jury *with any specific knowledge regarding Shauers' collision with Warger*." *Id.* at 51–52 (italics added). Here, MF's statements pertained to her familiarity with

the victim and his family in general rather than to any specific aspect of the case. *See Cunningham v. Shoop*, No. 3:06 CV 167, 2019 WL 6897003, at *17 (N.D. Ohio Dec. 18, 2019) (concluding that the petitioner's evidence of juror bias based on the juror's alleged relationship with the victims' families did not constitute extraneous information, involve outside influences or impart information specifically related to the facts of the case). Whether the victim and his family banked at the bank where MF worked, whether MF served on a board with the victim, and whether the victim's wife had lost weight had no bearing any issue in the case, and MF's familiarity with those facts was simply part of the general knowledge that she brought with her to the deliberations. *Cf. United States ex rel. Owen v. McMann*, 435 F.2d 813, 818–19 (2d Cir. 1970) (holding that three jurors' statements during deliberations that they knew all about the defendant and indicated that they had reason to believe that the defendant was guilty based on prior unfavorable incidents was impermissible extraneous evidence that violated the petitioner's Sixth Amendment rights); *McGail v. Noble*, No. 3:17-cv-251, 2018 WL 950184, at *3, 13 (S.D. Ohio Feb. 20, 2018), *report and recommendation adopted*, 2018 WL 5984055 (S.D. Ohio Nov. 14, 2018) (jury foreperson's statement during deliberations that the defendant must be lying because the foreperson had gone to the same church as the defendant and never saw the defendant or his family at that church was external information where the defendant made his credibility a central issue in the case by presenting testimony regarding his church attendance and activities). Petitioner cites no Supreme Court case indicating that the court of appeals' conclusion that the evidence of MF's comments concerned internal matters was unreasonable. I thus recommend that the Court conclude that the court of appeals' conclusion was neither contrary to, nor an unreasonable application of, any clearly established Supreme Court precedent, including *Warger*.

As for MF's statements to the effect that Petitioner killed the victim to save his marriage, the state-court's conclusion that they were intrinsic to the deliberative process rather than based on any external influence was both reasonable and supported by the record. Although Petitioner argues that the prosecution never offered that saving his marriage was a possible motive for Petitioner to commit the murder, the trial court reasonably concluded that evidence that Petitioner left the house early in the morning on October 1, 2013, following an argument with his wife and evidence regarding Petitioner's wife's anger during and following the October 1, 2013 meeting could have supported a juror theory that Petitioner killed the victim because his wife was going to leave him.

More importantly, Petitioner does not dispute the court of appeals' observation that nothing in MK's or BAS's testimonies, nor anything else in the record, suggests that MF's theory was based on anything other than the evidence presented at trial. Even if MF's theory had no record support, that would not transform her speculative statements from internal to external matters. *See United States v. Bussell*, 414 F.3d 1048, 1055 (9th Cir. 2005) (holding that jurors' speculation about why a defendant was no longer in the case was not "extraneous prejudicial information" because "[i]t did not enter the jury room through an external, prohibited route"). Accordingly, Petitioner fails to show that the trial court erred in granting his motion for a new trial or that the state court's decision was contrary to or an unreasonable application of clearly established Supreme Court precedent. Petitioner is not entitled to relief on his first claim.

### 2.    Juror Nondisclosure

Petitioner claims that his right to a fair and impartial jury was violated when MF failed to disclose information during *voir dire* that would have led to her being excused for cause. The Michigan Court of Appeals denied relief on this claim as follows:

A defendant has a right to be tried by a fair and impartial jury. *Duncan*, 391 U.S. at 153. "The purpose of voir dire is to elicit enough information for development of a rational basis for excluding those who are not impartial from the jury." *People v. Tyburski*, 445 Mich 606, 618; 518 NW2d 441 (1994). Defendant argues that he should have been allowed to prove his claim that MF hid her bias during jury selection with testimony from MK and BAS, as well as from MK, regarding [MF]'s conduct and statements during jury deliberations. We disagree. MRE 606(b) provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

The rules of evidence are interpreted pursuant to the principles of statutory construction. *People v. Snyder* (*After Remand*), 301 Mich App 99, 104; 835 NW2d 608 (2013). Thus, if the plain language of a rule of evidence is unambiguous, the Court "must enforce the meaning expressed, without further judicial construction or interpretation." *Id*. at 104–105 (quotation omitted).

MRE 606(b) is identical to FRE 606(b). In *Warger*, __ U.S. at __; 135 S Ct at 525, the United States Supreme Court held FRE 606(b) precluded the plaintiff from using an affidavit from a juror regarding what another juror said during jury deliberations to prove that the other juror was dishonest during jury selection. Noting that the language of FRE 606(b) was clear, the United States Supreme Court held that FRE 606(b) prohibits the use of any evidence of jury deliberations, subject only to the express exceptions for extraneous information, outside influences, and mistakes in entering the verdict on the verdict form. *Id*. at __; 135 S Ct at 527, n 2. We find the reasoning in *Warger* persuasive and hold that the plain language of MRE 606(b) prohibits the use of any evidence of jury deliberations, subject to the three stated exceptions. Consequently, the trial court was precluded from hearing and considering the testimony of MK and BAS, as well as the testimony of MF, regarding MF's conduct and statements during deliberations for the purpose of determining whether MF was dishonest during jury selection.

Relying on footnote 3 in *Warger*, defendant argues that MRE 606(b) should not apply to the present case because MF'a [sic] bias was "so extreme" that his right to an impartial jury was violated. In footnote 3, the United States Supreme Court

cautioned that "[t]here may be cases of juror bias so extreme that almost by definition, the jury trial right has been abridged. If and when such a case arises, the Court may consider whether the usual safeguards are or are not sufficient to protect the integrity of the process." We disagree that this is such a case. Even if the testimony of MK, BAS, and MF regarding MF's conduct and statements during deliberations would show that MF's bias against defendant was "so extreme," defendant makes no argument that the "usual safeguards," *see Tanner v. United States*, 483 US 107, 127; 107 S Ct 2739; 97 L.Ed.2d 90 (1987), were insufficient to protect his right to an impartial jury. We note that MF's alleged bias resulted from a close relationship with Locey, but defense counsel had the opportunity to probe the extent of MF's relationship with Locey during jury selection.

Defendant also wanted to question MF about the truthfulness of her statement during jury selection that she had only read "a bit" about the case. According to defendant, it was likely that MF had read "a lot" about the case because her daughter-in-law reported on the case for the local newspaper and posted her stories on Facebook, to which MF had access. Even though testimony from MF regarding how much she had read about the case was not barred by MRE 606(b), as it did not concern "any matter or statement during the course of the jury's deliberations ...," the trial court did not err when it prohibited defendant from questioning MF regarding what she had read about the case before jury selection. Contrary to defendant's claim, MF did not state that she had read "a bit" about the case. Rather, she said that she had "read things" about it. Accordingly, even if MF had read articles about the case that her daughter-in-law posted to Facebook, this fact does not establish that MF was dishonest during jury selection.

Because defendant did not present any evidence that could be considered by the trial court and which showed that MF was dishonest during jury selection, the trial court did not abuse its discretion in denying defendant's motion for a new trial which was based on MF's failure to disclose her bias during jury selection. *Miller*, 482 Mich at 544.

(ECF No. 8-27 at PageID.2925–26.)

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . . ." U.S. Const. amend. VI. The right to an impartial jury is applicable to the states via the Fourteenth Amendment. *See Turner v. Louisiana*, 379 U.S. 466, 471-72 (1965); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Further, "due process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan v. Illinois*, 504 U.S. 719, 727 (1992) (citations

14

omitted). "The *voir dire* is designed 'to protect [this right] by exposing possible biases, both known and unknown, on the part of potential jurors.'" *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003) (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)). Thus, "[t]he necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious." *Id.*

When a juror's impartiality is called into question, the relevant issue is "'did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality be believed.'" *Dennis*, 354 F.3d at 520 (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)). In order for a petitioner to be entitled to habeas relief based on a juror's non-disclosure during *voir dire*, the petitioner "must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough*, 464 U.S. at 556. The *McDonough* test applies regardless of whether it is alleged that a juror intentionally concealed information. *Dennis*, 354 F.3d at 520 (6th Cir. 2003) (citing *Zerka v. Green*, 49 F.3d 1181, 1185 (6th Cir. 1995)) (applying *McDonough*, which involved an inadvertent failure of a juror to disclose, to cases in which a juror intentionally failed to disclose)). As the *McDonough* Court explained, "[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *McDonough,* 464 U.S. at 556. "If a juror is found to have deliberately concealed material information, bias *may* be inferred. If, however, information is *not* concealed deliberately, the movant must show *actual bias.*" *Zerka*, 49 F.3d at 1186 (citation omitted).

The question of bias of an individual juror at a state criminal trial is one of fact. *Dennis,* 354 F.3d at 520 (citing *Patton,* 467 U.S. at 1036); *see also Sizemore v. Fletcher,* 921 F.2d 667,

672-73 (6th Cir. 1990) (citing *Smith v. Phillips*, 455 U.S. 209, 218 (1982)). A state-court decision based on a factual determination will not be overturned on factual grounds unless it was objectively unreasonable in light of the evidence presented in the state-court proceeding and not simply erroneous or incorrect. *Keith v. Mitchell,* 455 F.3d 662, 669 (6th Cir. 2006) (citing *Williams,* 529 U.S. at 409-11); *see also Young v. Hofbauer,* 52 F. App'x 234, 237 (6th Cir. 2002). The state-court's factual determination is entitled to a presumption of correctness, which is rebuttable only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The Michigan Court of Appeals ruled that the evidence Petitioner sought to introduce in support of his juror bias claim was inadmissible under Michigan's version of the no-impeachment rule, which generally precludes jurors from impeaching their verdict based on comments or discussions during deliberations. *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 861 (2017). Michigan's rule, Michigan Rule of Evidence 606(b), is identical to Federal Rule of Evidence 606(b). *Smith*, 962 F.3d at 201 n.2. The Supreme Court has rejected constitutional challenges to the federal rule as applied to evidence of juror misconduct. *See Tanner*, 483 U.S. at 126–27; *Warger*, 135 S. Ct. at 528–29. Rule 606(b) does not impair a defendant's Sixth Amendment right to an impartial jury because other protections, including *voir dire* and the court's and the parties' observations during trial, remain. *Id.* at 529. "Even if jurors lie in *voir dire* in a way that conceals bias, juror impartiality is adequately assured by the parties' ability to bring to the court's attention any evidence of bias before the verdict is rendered, and to employ nonjuror evidence even after the verdict is rendered." *Id.* (footnote omitted).

The court of appeals' determination that the evidence Petitioner sought to introduce—the affidavits and testimony of MK and BAS, as well as testimony from MF—was inadmissible juror deliberation evidence barred by Rule 606(b), and not extraneous prejudicial information

16

admissible under an exception to the rule, was reasonable. *See Austin v. Davis*, 876 F.3d 757, 790–91 (5th Cir. 2017) (noting that its prior grant of certificate of appealability based on the conclusion that post-trial juror interviews were not barred from consideration under Rule 606(b) because they concerned the honesty of jurors during *voir dire* rather than the jury's deliberative process was an erroneous application of *Warger*). As discussed above, the evidence was internal to the jury's deliberation. Thus, the trial court did not err in declining to consider post-verdict testimony from MF and properly declined to consider MK's and BAS's testimonies to impeach the verdict. The only non-juror-deliberations evidence Petitioner sought to present through MF's testimony was that her daughter-in-law wrote articles for the local newspaper and posted her stories on Facebook, which Petitioner alleged would have undermined MF's statement during *voir dire* that she had only read "a bit" about the case. As the court of appeals correctly observed, MF said that she had "read things in the media," which could reasonably include the articles that her daughter-in-law posted on Facebook. (ECF No. 8-10 at PageID.811.) Given MF's statement during *voir dire*, the court of appeals reasonably found that the information Petitioner sought to present would not show that MF was dishonest during *voir dire*.

After considering the testimony from MK and BAS and reviewing the transcript of the *voir dire*, the trial court found that MF had disclosed all of the things that MK and BAS had brought up, including that she knew the victim and his wife, had read news reports and that if she needed anything, she would go to the victim. (ECF No. 8-26 at PageID.2830–31.) The court found that in spite of those facts, "[t]he thing that saved her was her indication that she would set those things aside and not let it affect her and that, if her son was on trial, she'd want somebody like her because, if she did not feel that she could do it, she would disqualify herself and say that she couldn't." (*Id.* at PageID.2830.) The court further noted that MF had "indicated that she would not let sympathy

affect her in her decision and that if she couldn't be fair and impartial, [she] would disqualify [her]self . . . ." (*Id.* at PageID.2830–31.) Although MF did not specifically state during *voir dire* that the victim and his wife banked at the same bank where MF worked and that she was on a board with the victim, her disclosure that she knew the victim well enough that she felt comfortable asking him for donations adequately portrayed the depth of her relationship with the victim and his family. Disclosure of the additional facts cited by MK and BAS would have added little, if anything, of material significance to what the court and counsel already knew in judging MF's fitness to serve as a juror. In fact, the information MF did disclose prompted defense counsel to challenge MF for cause.

The state court's finding that MF honestly and fully answered questions during *voir dire* is presumed to be correct. Petitioner has failed to offer any evidence that would overcome the state court's factual findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

To the extent Petitioner asserts that his right to an impartial jury was violated because the trial court should have dismissed MF for cause based on her statements during *voir dire* that she had sympathy for the victim and his family, the argument lacks merit. As previously noted, when a juror's impartiality is at issue, the proper inquiry is "'did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality be believed.'" *Dennis*, 354 F.3d at 520 (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)). Because the issue is one of credibility, and the trial court "sees and hears the juror," *Wainwright v. Witt*, 469 U.S. 412, 426 (1985), its credibility determination is entitled to "special deference," *Patton*, 467 U.S. at 1038. "A trial judge's finding of juror impartiality may only be overturned where manifest error is shown." *White v. Mitchell*, 431 F.3d 517, 538 (6th Cir. 2005) (citing *Patton*, 467 U.S. at 1031). "The question for this Court is simply whether there is fair

18

support in the record for the state court's conclusion that the juror here would be impartial, not whether it was right or wrong in its determination of impartiality." *Allen v. Mitchell*, 953 F.3d 858, 864 (6th Cir. 2020) (internal quotation marks, citation and brackets omitted).

The record contains ample support for the trial court's determination that MF's would be impartial. In response to defense counsel's question about whether she would have sympathy for the victim, MF responded, "Absolutely," and explained, "I'm very sorry that it happened. He was good for the city. I'm sorry that it happened. I'm sorry for his family." (ECF No. 8-10 at PageID.811.) Later, when the prosecutor pointed out that the victim's wife and family would be attending the trial, MF said that she would "feel sympathy for the family." (*Id.* at PageID.813.) But as the trial judge noted during *voir dire* and confirmed later during the post-trial evidentiary hearing, although MF said "she would feel sympathy as any human would for a victim in such a case . . . she would set any sympathy aside and not let it affect her decision and that she may have known Mr. Locy but she does not feel that her acquaintance with him would affect her ability to be fair and impartial." (*Id.* at  814–15.) Although asked repeatedly whether she could be fair and impartial given her acquaintance with the victim and his family, MF never wavered from her assertion that it would not affect her decision and that she would disqualify herself if she thought she could not be impartial. (*Id.* at PageID.809, 812, 814, 816.) In light of the deference that must be accorded the trial court's credibility findings, Petitioner fails to show manifest error.

The denial of this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law. Furthermore, the decision was not based on an unreasonable

determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue on which habeas relief may be granted.[3]

### B.    Admission of Expert Testimony

Petitioner next argues that the trial court's admission of cell tower evidence violated his right to a fair trial. During trial, the court held a separate hearing regarding the admissibility of Detective Trooper Specialist Paul Gonyeau's proposed expert testimony regarding the location of Petitioner's cellphone. Gonyeau testified that he attended three courses in which he received training in the use of cell tower data to create maps showing the general location of a cell phone. (ECF No. 8-18 at PageID.2032–38.) Gonyeau used information from the cell service provider of the device to create the maps. (*Id.* at PageID.2055–56.) Gonyeau testified that he had created maps for use in at least 75 to 100 separate events or occurrences, both in real time and historically. The same procedure is used for preparing real time and historical maps. Approximately 40–50 of the maps Gonyeau prepared were in real time. (*Id.* at PageID.2062.) The court allowed Gonyeau to testify as an expert in the use of technology in interpreting cellphone records and their placement on maps to determine the location of a cellphone device. (*Id.* at PageID.2107.) Gonyeau testified that Petitioner's cellphone activity hit the same locations on October 1, 2013, during the meeting with the victim at the office, as were shown on his map depicting Petitioner's cellphone location

---

[3] To the extent Petitioner relies on footnote 3 from *Warger* to argue that the instant case presents "juror bias so extreme that, almost by definition, the jury trial right has been abridged," 135 S. Ct. at 529 n.3, the Court's observation that "[t]here may be cases" is dicta that cannot clearly establish the law for purposes of AEDPA. *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003); *see also Ali v. Grounds*, 236 F. Supp. 3d 1241, 1264 (S.D. Cal. 2017) (finding the petitioner's reliance on *Warger*'s "extreme" bias comment "unpersuasive" because it was not based on clearly established federal law). Thus far, the Court has relied on the statement in footnote 3 only once, holding that the bar in Rule 606(b) must yield when a juror relies on racial stereotypes or animus in reaching a verdict. *Pena-Rodriguez*, 137 S. Ct. at 869.

between 7:05 and 7:20 a.m. on October 2, 2013, which placed Petitioner's cellphone within the area of the office. (*Id.* at 2145.)

The Michigan Court of Appeals rejected Petitioner's claim as follows:

The admission of expert testimony is governed by MRE 702. *Edry v. Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010). MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under MRE 702, a trial court has a gatekeeper function to ensure that any expert testimony admitted is reliable. *Gilbert v. DaimlerChrysler Corp.*, 470 Mich 749, 780; 685 NW2d 391 (2004). MRE 702 incorporates the standards of reliability that the United States Supreme Court articulated in *Daubert v. Merrell Dow Pharm., Inc.*, 509 US 579; 113 S Ct 2786; 125 LEd2d 469 (1993). *Edry*, 486 Mich at 639. The United States Supreme Court explained in *Daubert*, 509 US at 593–594, that many factors will bear on whether expert testimony is reliable, but it listed four specific factors that may be relevant: (1) whether a theory or technique has been or can be tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) whether the theory or technique has a known or potential rate of error, and (4) whether the theory or technique has been generally accepted by the relevant scientific community.

. . . .

Defendant also argues that the trial court erred in qualifying Detective Trooper Specialist Paul Gonyeau as an expert and allowing him to testify about the location of defendant's cellular telephone. The issue whether the trial court erred in qualifying Gonyeau as an expert is preserved because the trial court qualified Gonyeau as an expert following a hearing on the admissibility of his testimony, *see* MCR 2.517(7), and is reviewed for an abuse of discretion, *Unger*, 278 Mich App at 216. Defendant's two remaining arguments regarding Gonyeau's testimony, i.e., that the underlying data was unreliable because the evidence did not establish that the data communications from defendant's cellular telephone used the closest cellular telephone tower and that Gonyeau's testimony was fraught with guesswork, are unpreserved. Although defendant objected to the admission of Gonyeau's testimony, these two arguments were not made before the trial court, *see Aldrich*, 246 Mich App at 133, so they are only reviewed for plain error, *Benton*, 294 Mich App at 202.

21

The admission of expert testimony requires the witness to be an expert. *Surman v. Surman*, 277 Mich App 287, 308; 745 NW2d 802 (2007). The plain language of MRE 702 provides that a witness is qualified to testify as an expert based on "knowledge, skill, experience, training, or education." The trial court qualified Gonyeau as an expert in the use of technology to determine the locations of cellular telephones from information received from service providers. Defendant correctly states that before the present case, Gonyeau had never been qualified as an expert; Gonyeau testified that he had attended three trainings that addressed how to determine the location of a cellular telephone from information provided from a service provider. Since 2011, using his training, Gonyeau has created 75 to 100 maps. About half of the maps that Gonyeau created were used in cases where the police were attempting to find a cellular telephone in real time, and in most of those cases, the maps successfully allowed police officers to find the telephone. Based on this testimony, the trial court's decision to qualify Gonyeau as an expert in the use of technology to determination the locations of cellular telephones from information received from service providers did not fall outside the range of reasonable and principled outcomes. *Id.* at 305; *Unger*, 278 Mich App at 217.

In reaching this conclusion, we find no merit to defendant's claim that Gonyeau was not qualified as an expert because he did not understand how the information received from service providers was generated. A trial court must ensure that the data underlying the expert's theories is reliable. *Gilbert*, 470 Mich at 779. Expert testimony should be excluded when it is derived from unreliable and untrustworthy data. *People v. Dobek*, 274 Mich App 58, 94; 732 NW2d 546 (2007). That Gonyeau lacked knowledge of how the information he received from service providers is generated is relevant to the question whether the data underlying his testimony was reliable, not to the question whether he was qualified to be an expert in using technology to determine the locations of cellular telephones from information received from service providers.

We further reject defendant's argument that Gonyeau's expert testimony was unreliable because Gonyeau failed to establish that defendant's cellular telephone used the closest cellular telephone tower. The argument concerns the map showing the activity of defendant's cellular telephone, which consisted of data communications, from 7:05 to 7:20 a.m. on October 2, 2013. Defendant's argument is irrelevant. Gonyeau's testimony regarding the location of defendant's cellular telephone was based on the sectors of the cellular telephone towers that were used by the data communications. Whether the data communications used the closest cellular telephone tower to the telephone played no part in Gonyeau's testimony.

We also find no merit to defendant's claim that Gonyeau's testimony should not have been admitted because it was too inexact and fraught with guesswork. The basis for the argument is Gonyeau's testimony that he was only able to create "approximate" boundary lines for the sectors of the cellular telephone towers and that the area where he believed defendant's cellular telephone was located between 7:05 and 7:09 a.m. on October 2, 2013, consisted of a range of miles. Defendant makes no successful argument that the techniques Gonyeau used from information

he received about defendant's cellular telephone from Verizon were not reliable under MRE 702. Accordingly, defendant's argument concerns the weight of Gonyeau's testimony rather than its admissibility.

(ECF No. 27 at PageID.2919–22.)

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). "[C]ourts have defined the category of infractions that violate fundamental fairness very narrowly." *Bugh*, 329 F.3d at 512 (internal quotations and citations omitted). Fundamental fairness does not "require a perfect trial." *Clemmons v. Sowders*, 34 F.3d 352, 358 (6th Cir. 1994).

As an initial matter, this Court may not consider the January 10, 2018 declaration of Manfred Schenk, which Petitioner has attached as Exhibit G to his habeas petition and relies on in support of his argument that the scientific community does not recognize the use of historical site records to locate a cellphone with precision. (ECF No. 1-1 at PageID.237–39.) A habeas court's consideration of an issue is limited to the record presented to the state court. *Cullen v. Pinholster*, 563 U.S. 170, 180–85 (2011). The Michigan Court of Appeals adjudicated Petitioner's claim on the merits. *See* 28 U.S.C. § 2254(d)(1).

23

Petitioner also fails to show that this Court should consider the claim on habeas review. "The admission of expert testimony in a state trial presents a question of state law which does not warrant federal habeas relief unless the evidence violates due process or some other federal constitutional right." *Randolph v. Wolfenbarger*, No. 04-CV-73475, 2006 WL 1662885, at *5 (E.D. Mich. June 12, 2006) (citing *Keller v. Larkins*, 251 F.3d 408, 419 (3d Cir. 2001); *see also Adesiji v. Minnesota*, 854 F.2d 299, 300 (8th Cir. 1988) (whether expert testimony regarding general patterns of credibility among children reporting sexual abuse was properly admissible was "essentially a matter of state law"). "Similarly, a determination as to whether an individual is qualified to give expert testimony involves only a state law evidentiary issue." *Randolph*, 2006 WL 1662885, at *5 (citing *United States ex. Rel. Ruddock v. Briley*, 216 F. Supp. 2d 737, 743 (N.D. Ill. 2002)). Petitioner fails to show that the state court's determination that Gonyeau qualified as an expert under Michigan's rules of evidence or that his testimony was reliable violated fundamental fairness.[4]

 As the Sixth Circuit has recognized, to obtain habeas relief based on an allegedly improper evidentiary ruling, Petitioner must identify "a Supreme Court case establishing a due process right with regard to the *specific kind of evidence* at issue." *Stewart v. Winn*, 967 F.3d 534, 538 (6th Cir. 2020). In the absence of Supreme Court authority holding that the admission of expert testimony

---

[4] It is worth noting that numerous federal courts have admitted similar expert testimony from law enforcement agents who have been trained to use cellphone/tower records to create historical maps showing the general location of a cellphone at a given time. *See, e.g.*, *United States v. Freeman*, No. 06-20185, 2015 WL 2062754, at *3–4 (E.D. Mich. May 4, 2015) (finding the agent's testimony reliable even though he did not use a propagation map because, "[w]hile propagation maps are a reliable source to create coverage maps, they are not the only source available to law enforcement"); *United States v. Eady*, No. 2:12-cr-415, 2013 WL 4680527, at *3–4 (D.S.C. Aug. 30, 2013), *aff'd*, 599 F. App'x 116 (4th Cir. 2015) ("While the law in this area is still developing, this court agrees that the overwhelming consensus of judicial authority favors a finding that methodology of the kind employed by Special Agent Sutton is reliable.").

violates the Constitution, laws, or treaties of the United States, Petitioner is not entitled to habeas relief.  *Bugh*, 329 F.3d at 512-13; *Winn*, 967 F.3d at 538.[5] Accordingly, this claim raises no issue upon which habeas relief may be granted.

### 3.      Ineffective Assistance of Counsel

In his fourth ground, Petitioner argues that his trial counsel was ineffective for failing to present expert testimony to challenge the opinions of the prosecution's expert on gunshot primer residue. At trial, the prosecution presented testimony from Allison Murtha of R.J. Lee Group as an expert in gunshot residue. (ECF No. 8-20 at PageID.2356–57.) Murtha testified that R.J. Lee Group examined particles from clothing Petitioner was wearing and clothing that had been found in his vehicle on October 2, 2013, as well as samples taken from the inside and outside driver's door handles and the turn signal lever of Petitioner's vehicle. (*Id.* at PageID.2390–91.) Murtha explained that a discharge of a firearm releases elements of lead, antimony, and barium and that particles that contain all three elements, or three-component particles, are classified as gunshot residue. (*Id.* at PageID.2365–66.) Murtha said that gunshot residue can be deposited if a person discharges a firearm, is in proximity to a discharged firearm or contacts a surface or object containing firearm residue. She further testified that two-component and one-component particles are also found in gunshot residue but may originate from other sources. Finally, she said that the absence of gunshot residue does not eliminate the possibility that the subject handled or discharged the firearm. (*Id.* at PageID.2387–88.) Murtha testified that they had found one gunshot residue

---

[5] The *Winn* court cited its decision in *Ege v. Yukins*, 485 F.3d 364 (6th Cir. 2007), which held that the admission of "critical" but unreliable expert testimony that, of the 3.5 million residents in the Detroit metropolitan area, only the petitioner's teeth could have made the mark on the victim's cheek, violated due process. 967 F.3d at 540. The court noted that *Ege* relied on *Chambers v. Mississippi*, 410 U.S. 284 (1973), which dealt with the improper exclusion of evidence in a capital case and not the admission of expert testimony. The court observed that *Ege* "predate[d] the Supreme Court's recent AEDPA teachings not to frame its 'precedents at such a high level of generality.'" *Id.* at 540 (quoting *Nevada v. Jackson*, 569 U.S. 505 (2013)).

particle, three two-component particles and at least 18 one-component particles on the left side of Petitioner's jacket and two two-component particles and at least 26 one-component articles on the left sleeve. (*Id.* at PageID.2394–95.) The remaining articles of clothing and other items contained gunshot residue particles and one- and two-component particles. (*Id.* at PageID.2395–97.)

At the *Ginther* hearing in connection with Petitioner's motion for a new trial, Petitioner's trial counsel, Michael Hills, testified about his gunshot residue investigation. Hills testified that he looked for his own expert and consulted with two individuals, eventually settling on Michael Trimpe. (ECF No. 8-26 at PageID.2583–54, 2861.) Hills discussed the issues concerning gunshot residue evidence with Trimpe in preparation for the *Daubert* hearing and for trial but decided not to call him at trial. (*Id.* at PageID.2862.) Hills made that decision, in part, because Trimpe would have testified consistently with the prosecution's expert. (*Id.* at PageID.2856–57.) The trial court concluded that Petitioner failed to show that Hills had been ineffective. (*Id.* at PageID.2912–13.)

The Michigan Court of Appeals denied this claim as follows:

Defendant claims that he is entitled to a new trial because he was denied the effective assistance of counsel. The determination whether a defendant was denied the effective assistance of counsel is a mixed question of fact and constitutional law. *People v. Seals*, 285 Mich App 1, 17; 776 NW2d 314 (2009). A trial court must first find the facts and then decide whether those facts constitute a violation of the defendant's right to effective assistance of counsel. *People v. LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). We review a trial court's findings of fact for clear error, but review de novo questions of constitutional law. *Id.*

To establish a claim for ineffective assistance of counsel, a defendant must show that counsel's performance fell below objective standards of reasonableness and that but for counsel's deficient performance there is a reasonable probability that the result of the proceedings would have been different. *Seals*, 285 Mich App at 17. A defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *LeBlanc*, 465 Mich at 578.

. . . .

Defendant also argues that defense counsel was ineffective for failing to present an expert in gunshot residue at the Daubert hearing or at trial. Decisions whether to call or question witnesses, including expert witnesses, are presumed to be matters

26

of trial strategy. *People v. Ackerman*, 257 Mich App 434, 455; 669 NW2d 818 (2003); *People v. Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). Defense counsel testified that he sought an expert in gunshot residue. The second expert he consulted was Michael Trimpe. And, after reviewing Trimpe's credentials, defense counsel did not attempt to consult a third expert. Defense counsel had lengthy conversations with Trimpe, in which they discussed, in part, the procedures the RJ Lee Group used, the limited evidentiary value of gunshot residue, whether Trimpe would expect more than five particles of gunshot residue on defendant's clothing if defendant shot a gun, whether Trimpe would opine whether the five gunshot residue particles made it more likely than not that defendant shot a gun, and the possibility of cross-contamination by police officers. Based on these conversations, defense counsel chose not to present Trimpe as an expert at the Daubert hearing or at trial. Under these circumstances, defendant has failed to overcome the strong presumption the defense counsel's decision constituted sound trial strategy. *LeBlanc*, 465 Mich at 578. Defense counsel was not ineffective for failing to present an expert in gunshot residue at the Daubert hearing or at trial.

(ECF No. 8-27 at PageID.2926–28.)

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, considering the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court

determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court has observed, while "'[s]urmounting *Strickland*'s high bar is never an easy task,' . . . [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 1485 (2010)). Because the standards under both *Strickland* and Section 2254(d) are highly deferential, "when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). In those circumstances, "[t]he question [before the habeas court] is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

"Decisions as to whether to call certain witnesses or what evidence to present are presumed to be matters of trial strategy, and the failure to call witnesses or present evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense." *Collins v. Berghuis*, No. 1:08-cv-369, 2011 WL 4346333, at *16 (W.D. Mich. Aug. 22, 2011) (citing *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004), and *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002)); *see also Matthews v. United States*, No. 1:05 CR 204, 1:09 CV 2421, 2010 WL 3749520, at *6 (N.D. Ohio Sept. 21, 2010) ("Trial counsel's decisions about what evidence to present and whether to call a particular witness are matters of trial strategy, especially when counsel is aware of the potential witnesses and the substance of their testimony."). Moreover, "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington*, 562 U.S. at 111.

"In many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Id.*

Here, counsel adequately investigated the issues in the case regarding gunshot residue and, after consulting with Trimpe, made an entirely reasonable decision not to call him at trial but instead to use the information he gained from his consultations with Trimpe to minimize the effect of the prosecution's gunshot residue evidence. Counsel used that information not only at the *Daubert* hearing, but also at trial to point out the limited evidentiary value of the gunshot residue evidence. Petitioner fails to present any evidence to overcome the strong presumption that counsel's decision was a matter of sound trial strategy.

Accordingly, I recommend that Petitioner is not entitled to relief on this claim.

### Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, I have examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537

29

U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

I find that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims would be debatable or wrong. Therefore, I recommend that the Court deny Petitioner a certificate of appealability.

Moreover, although I conclude that Petitioner has failed to demonstrate that he is in custody in violation of the constitution and has failed to make a substantial showing of a denial of a constitutional right, I would not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

### Recommended Disposition

For the foregoing reasons, I recommend that the Court deny Petitioner's habeas petition. I further recommend that a certificate of appealability be denied. Finally, I recommend that the Court not certify that an appeal would not be taken in good faith.

Dated: January 25, 2021                                /s/ Sally J. Berens
                                                       SALLY J. BERENS
                                                       U.S. Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).